Good afternoon. This is the Court. Ryan Denny for Appellant, Dr. Craig Kessler. Before you were here on Dr. Kessler's Rule 306 Petition for Leave of Appeal. On behalf of Dr. Kessler, we'd like to thank you for being here today, and we'd also like to thank you for joining us today for this very important hearing. We believe that the extremely limited contacts between Dr. Kessler and Illinois, when viewed in light of the controlling precedent and the facts of this case, makes clear that the lower court's decision to exercise specific personal jurisdiction in this case was incorrect. As this Court is aware, this case involves two short, distinct contacts between a doctor who works and lives in the Washington, D.C. area with a doctor who works and lives in Peoria, Illinois. The emails themselves were exclusively in response to an inquiry from a Peoria resident. There's no evidence that Dr. Kessler reached out to Dr. Tarantino about these issues, nor that Dr. Kessler made any effort to become involved and was merely responding to information that was provided to him. There's no evidence in this case whatsoever that Dr. Kessler has ever been to Illinois, that he has any financial interest in Illinois, or any other evidence that would tie him to the state of Illinois other than, without exaggeration, these two short emails. For the purposes of my analysis and my argument today, I think it's important that we focus on the factual differences between what Dr. Kessler engaged in with respect to his two emails, notwithstanding whether they were defamatory or not, and the case law that exists in Illinois and, to a certain extent, at the federal level, given the fact that the appellee has depended so heavily on, maybe exclusively on, federal case law to establish personal jurisdiction in this case. To be clear, the emails themselves were sent to a single individual. They contain very matter-of-fact explanations and observations and are short in both substance and bereft of hyperbole, insult, or any kind of gossip. As your honors are aware, the two emails themselves are as clinical as you'd expect a doctor to be, and it's almost an evaluation of the situation, very plain, very general language, nothing that would necessarily defame Dr. Wesley in this case, but as the court is aware, in this case, and for the purposes of the appeal, we have to assume that they're defamatory. My argument today is not that these statements themselves don't constitute defamation per se, but simply that the actions of Dr. Kessler himself simply do not satisfy Illinois' two-pronged test for the determination of specific personal jurisdiction. As this court is aware, under Illinois state law, that is two-pronged analysis, whether the minimum contacts of a particular individual who is outside of Illinois fall under the Illinois long-arm statute, and whether under both the Illinois and United States Constitution, whether the notions of fair claim and substantial justice under due process are satisfied as well. We believe that neither have been met in this case. In an effort to not simply restate the arguments contained within the briefs, we believe that comparing the facts themselves is the most important analysis that the court can engage in for the purposes of overturning the lower court's decision. Although Appellee's counsel has virtually ignored both the Hansen and Bobless cases, which are extolled at length in our brief as well as our reply, the holdings in Hansen hinge upon the following facts that bear consideration in this case. First, the defendants in Hansen, as well as the defendant in this case, took no affirmative action to conduct any activities in Illinois. In Hansen, those were individuals who literally received a phone call from someone in Illinois, were asked questions about something that they may or may not have been involved in, they denied any involvement, and that was the extent of their contact. They had two separate and distinct phone calls. And Hansen, of course, also held that, contrary to Appellee's argument in this case, that the last act doctrine, namely that, well, I've suffered damages in Illinois, and therefore, personal jurisdiction is appropriate, they also threw that argument out. In this case, the parallels, we believe the parallels couldn't be any clearer. The court in Hansen, assuming the statements were defamatory, as we must do in this case again, held that two singular conversations created, quote, only extremely attenuated, unquote, contacts within Illinois. And we believe that was the case in this situation with respect to Dr. Kessler. The focus of my argument is that the response is... I think there's a little bit of difference because the two phone calls in the other case, they were just questions answered. Indeed. And here, Dr. Kessler actually forwards an email from Mr. Tarantino, correct? No. To Val. Oh, well, I can address that, Your Honor. And that is someone that he knows is in Illinois and knows that, you know... So he's not just answering a question or having a one-way conversation with somebody, but he's actually taking that information and sending it to somebody else, correct? That's actually incorrect, Your Honor. The two emails that... And this is going in depth in the briefs itself. The two emails that plaintiffs kind of stick their flag on are two emails that were exclusively from Dr. Kessler to Dr. Kessler in D.C. to Dr. Tarantino in Peoria. He did not resend a single email. He did not republish anything anyone else says. Appellee, I believe, will admit that, or else that would be news to me. Essentially what he offered was his own opinions on two separate distinct brief occasions to Dr. Tarantino in Peoria. The other email that Appellee's counsel has included as an exhibit in their amendment complaint was to a gentleman called Val Bias. That may be the one you're referring to. That email was sent from the District of Columbia to the New York, New Jersey area. There is no evidence in this case whatsoever that the third email that was exclusively to Dr. Bias... Actually, I don't believe he was a doctor. I think it's Mr. Bias who's the director of NHF, the National Hemophilia Foundation. He was in New York and New Jersey. We provided an affidavit that is in the record establishing that the other email that is exclusively to Dr. Bias was to New York and New Jersey and has nothing to do with Illinois whatsoever. So that's the distinction. And that's actually... Your Honor's question actually speaks to the distinction that I think is absolutely crucial in this case. Although the factual circumstances between any two cases are never exactly the same, we believe that the responses of the defendants in Hanson and Dr. Kessler are roughly equivalent. Again, roughly equivalent. Both were asked about the veracity of certain information. Both denied the accuracy of certain information in discreet, simple, short conversations between only two individuals. They didn't reach out and express their opinion. They were asked about certain information and they responded. Neither sought their involvement in the communications and both were merely responding to an inquiry from a person who happened to be in Illinois. It's sort of an active versus passive situation. In the Bambas case, which this Court previously held, personal jurisdiction was appropriate. The defendants in that case contacted the plaintiff directly. Not in this case. They had an interactive website where they sought sales from Illinois. They actually put information out into the world writ large that actually subjected them to the personal jurisdiction of Illinois. It's the sort of active versus passive distinction that I think is appropriate in this case. With respect to the Hanson case, which again is the sort of crux of our argument, the Appellee's counsel really doesn't make that much of an effort to distinguish Hanson, but he does say two things. One, that somehow this makes a difference, that the statements about Dr. Wesley are false, which I'm assuming the plaintiffs in Hanson did, so there's no difference there. And that Dr. Kessler knew the Appellee would be injured in Illinois. Again, an argument which is specifically rejected by the Hanson Court, the last act doctrine. Simply put, there's no basis for Hanson not to be controlling in this case. It is the only case that has even remotely similar interactions and a remotely similar basis for personal jurisdiction, and we think that Hanson should be controlling. I'd kind of like to jump ahead quickly to the federal arguments. Appellee's counsel relies almost exclusively on the Tamburo case. It doesn't make a whole lot of sense to me, but for the purposes of our argument, I think it's appropriate for me to address it. Again, the appellants in this case don't see that federal case law is controlling or even appropriate for the analysis in this case, but I think it's appropriate given the fact that Appellee has relied almost exclusively on the Tamburo case. As we state in our briefs, Tamburo isn't even controlling anymore. It's essentially overturned by the NTE case, which we cite in our briefs. But, again, focusing on the factual differences, what an individual did, the passive versus active role in this case, the acts that took place in Tamburo, that involved defendants who reached into Illinois and encouraged hundreds of individuals to boycott the plaintiff. He provided that person's address. They contacted the plaintiff directly. There was a series of actions that were taken, active actions taken by the defendants in this case, to harm that individual within Illinois, which created under NTE, which is called a meaningful connection to Illinois. In this case, I believe that the review of the two emails on pages 33 and 38 of the record established that Dr. Kessler was simply responding to information that was sought from him. He is on the board of NHF. An individual who just happened to be in Illinois asked him about certain allegations made against the plaintiff, none of which were made by Dr. Kessler. He didn't echo a single one of them. He didn't call him any names or he didn't actually defame him in any way. Again, that's not an analysis that's appropriate for today. But in analyzing what Dr. Kessler did in this case and directly comparing it to the Tamburo case, which Appleby's rely on almost exclusively, establishes that there simply wasn't the meaningful connection to Illinois between Dr. Kessler and Illinois. And as a result, personal jurisdiction over Dr. Kessler is not appropriate. It's important to look at the kind of language that's used in Tamburo. They use terms like fraud, theft, hacking. Dr. Kessler uses two emails. And again, it's important to focus on the two emails that are at stake here. He uses terms like embarrassed and difficulties. This is much more generic, almost observational language versus active language attempting to encourage a boycott, encourage an individual to suffer economic consequences in Illinois. In this case, I don't think that the two emails, again on page 33 and 38, actually support that type of activity or personal jurisdiction in this case. I guess in closing, the important thing to keep in mind as far as the accounts are concerned is that both the tone and intent are completely different. Dr. Kessler was very reserved in his emails to one other doctor, again, who just happens to be Illinois. The federal case law that we cite to in this case, again, if it is controlling, establishes that where an email happens to be open, again, is almost incidental for the purposes of establishing specific personal jurisdiction over a defendant. And this court should examine what each individual is attempting to accomplish. Dr. Kessler was merely reexamining whether an award was appropriately given. The defendants in Tamboro were actively encouraging financial ruin for the plaintiffs in that case. And without repeating myself, I would like to again stress that the email that I expect Applebee's will point to, to Mr. Bias, which contains the word fraud, is not at stake in this case. The only two emails we're talking about are on page 33 and 38. The email that was sent to Mr. Bias was from D.C. to the New York, New Jersey area, that is in the record, that is uncontroverted. There is no indication that anybody in Illinois ever heard, read, or otherwise received that email from Mr. Bias, even if we assume that that was written by Dr. Kessler, which for the purposes of this case we have to. Thank you. Lastly, with respect to the due process argument, my argument is pretty simple. I want to back up because on C-47, the email that you said that just went from D.C. to New Jersey or vice versa, it was a forwarded email that originally came from an iPhone that was registered to a Michael Tarantino, who is the Medical Director of the Bleeding and Clotting Disorders at the University of Illinois College of Medicine, Peoria. So Craig forwards that email that came from Illinois to, well.  So for the purposes of establishing personal jurisdiction in this case, again, if we assume that the affidavit stands uncontroverted, that email was sent from D.C. to New York, for the purposes of establishing a specific personal jurisdiction, this court is required to analyze what activities Dr. Kessler took with respect to Illinois. If we assume that Dr. Tarantino wrote that in Illinois, and I'm not sure that that's anywhere in the record that establishes that one way or the other, but even for the purposes of argument, if we assume that that was the case, then again, that would establish personal jurisdiction in New York and New Jersey where he sent the email. It doesn't establish that he had any further contact with Illinois. All he took was information that, again, if we assume he received it from Illinois, then he stepped into, maybe, into New York and New Jersey. He didn't further insinuate himself into Illinois at all. And that kind of gets to my last argument with respect to, under the due process analysis, whether it's appropriate for Dr. Kessler to come here. He's never been to Illinois. There's no indication that he has any associations or connections with Illinois. Having him come all the way into Illinois, and there's no evidence he availed himself of the benefits and protections of Illinois law. He simply sent two emails to Dr. Tarantino, which just happened to be where he was. There's no evidence that he opened those emails, but let's assume he did. That's all we have. And under a sort of fairness standard that's from international shoe all the way down to today, I don't think that that satisfies the notions of fair, plain, substantial justice to make him fly in here and spend months in Illinois. Plaintiffs' counsel can sue him in D.C. or America. There's nothing stopping him from doing that. He's tried to sue Georgetown in the past. They were dismissed for similar reasons. But there's nothing stopping him from doing it there. Hailing him all the way into Illinois to disrupt his life for weeks or months on end with two emails that were sent to Illinois, I simply don't think it's fair or appropriate. Thank you. Mr. Vickery. My name is Paul Vickery. I represent the Helen. I think what's been overlooked by counsel is that there was a targeting. And it was targeting the connection of Dr. Wesley to Peoria. It wasn't just an attenuated fact or fortuitous. It was the entire reason why Dr. Kessler jumped in the fray and persuaded NHF to send out this blast. And I'm going to focus on two things. Well, first of all, I just want to say that the attempt to cabin this into two innocuous emails into Illinois is completely inappropriate. And Judge Bukuski rejected the idea, the argument, that this is a numbers game. I'm going to do two things. I'm going to walk through the chronology because it's very important. And then I'm going to talk about one case. Walden v. Peoria. Because I think that that's the battleground here. Walden controls everything. We don't even have to get into Tamboro even though I think it still applies. It's appropriate. What happened here? My client received this very prestigious award, the most prestigious award you could get in the hemophilia community. National Hemophilia Association Awards for Doctor of the Year. Big deal. And they focused on his practice in Peoria. There's a big video. Emails go out. The very next day, the very next day, Dr. Kessler, at 734, on a Saturday, he says, Mike, he's known Tarantino, which is a bitter rival for whatever reason. And they're in the same competitive locale, Peoria and Springfield. Bitter rival of my client. Kessler, dear Mike, I'm so sorry I was not aware of it. Wait, wait, wait. Started in the wrong place. 737 a.m. on a Saturday morning. Kessler emails Tarantino from the NHF board meeting. He's at the board meeting. They just awarded my client this huge award. He says, I'm at the NHF board meeting this morning, and I spoke to Val. He's the executive director. The physician of the year award was given to an individual from your area. What's your area? He knows it's Peoria because they've known each other for years, and Tarantino always sends emails back indicating that his office is in Peoria. And he knows he's in Peoria, and he knows my client's in Peoria. From your area, who apparently has turned out to have some background difficulty. He talks about legal difficulties he's been associated with. I have suggested to Val that if the accusations against this individual are still active, and if he's under OIG investigation, that his ethical situation should invalidate his award. And by the way, it's important to also understand how we got this information. When Sue responded, we didn't know when NHF had sent out this email blast saying, we are investigating. There's been irregularities with my client's credentials. We may take away the award. It gets reported by all the Peoria states, not all of them, but the major one in Peoria. It gets reported on their website, email blasts all around, and it results in horrific problems for my client. We were asked for the court in Peoria rule 224 discovery. We sent interrogatories to NHF. On what did you base this report? Where did you get this information? They say under oath, Dr. Kessler, Dr. Tarantino, and a few others, but they lead off with Dr. Kessler. We don't know exactly what happened. We had limited discovery at the time that the case was stated because of this appeal. The limited discovery included some of these emails. So he's emailing his buddy in Peoria. He says his ethical situation should invalidate his award. Are you able to provide any information about this offline? He gives him his cell number. Furthermore, I have indicated to Val and the NHF the importance of supporting you and your HTC. HTC is the hemophilia treatment center, and he knows it's located right in Peoria. He's telling NHF, look, we should be supporting this guy over his competitor. Personally, I'm going to apologize since I would never have let this occur. Let me know your thoughts. And then Tarantino unloads two different emails, all about his interactions with my client about how supposedly he's a fraud and a liar. He's being investigated. His emails are peppered with references to Springfield. He's doing this in Springfield. I was also told by an attorney here in town he was under investigation for fraud at a hospital in southern Illinois. Apparently he was having an RN admit one or more patients in his name while he was either in Springfield or Peoria. So all of this is, again, it's not like it's fortuitous that Dr. Wesley happened to be an Illinois citizen. It all is related. It's central to Dr. Kessler's effort to undo this great honor that had been bestowed on Tarantino's libel. Not satisfied with that, he sends another email, very lengthy, and this is all pages 11 and 12 of our brief, and it's pages in the record starting at RC33. It goes to 37. Another email where he says, I'm also told that the state of Illinois is looking at his prescribing practices. And, again, this is venom, spewing venom. And we say Tarantino's invective worked because at 7.34 p.m. Dr. Kessler assured Tarantino that he would instruct the NHF to take decisive action due to what he called false credentials. Dear Mike, I'm so sorry I was not aware of this situation. I was not part of the nomination committee. However, I am going to discuss with Val that we should withdraw the award based on the false credentials. He's saying we. He's playing an instrumental role in orchestrating how NHF is going to undo this honor that's bestowed on my client because of this feud that he's got with Tarantino. He repeatedly references the NHF as we. I will keep you apprised. I agree this is very embarrassing to NHF. Then we get an email. Counselor didn't want to talk about it. He talked about there are only two emails. There are plenty of emails. The string is very lengthy. And so then he sends his colleague on the board an email that night telling the NHF that Dr. Wesley is, quote, a complete fraud. Dear Val, please read the response from Mike Tarantino regarding the credentials of the winner of Physician of the Year Award. This guy is a complete fraud. This is an embarrassment to NHF. We need to move rapidly to avoid embarrassment. And sure enough, they did. Because the very next day, this is 9 o'clock at night on I think a Sunday. The very next day, they send out their email blast, their website posting, and it does the damage. Now I want to turn to Walden v. Fiore. And that case is, I submit to you that that case, both parties have cited a lot of cases. But I think this is the Supreme Court's most recent pronouncement on specific jurisdiction, and this is what Judge Bukoski found existed in this case. And the whole idea there was the court said, look, you can't rely on a defendant's random, fortuitous, or attenuated contacts to establish jurisdiction. And what's important, it's important to know the facts in Walden v. Fiore. There, the plaintiffs were coming from San Juan. They had $97,000 of cash in their badge. They were stopped in San Juan and said, where did you get this cash? They're trying to see, is there drug running going on? The San Juan agents, they asked them some questions. They said, well, we wanted it in a casino. And, well, where are you going on to? Well, we're going to Atlanta Hartsfield. So they telephoned the folks at Atlanta Hartsfield. They detained the folks at the airport, detained the, I think it was DEA agent, detained the plaintiffs, asked them questions, had a drug-sniffing dog sniff the cash. They said, well, we're going to keep the cash. And, by the way, the plaintiffs told the people in San Juan, where do you live? Well, they said, well, we have two residences, one in California and one in Nevada. Okay. So the officer in question, who gave the letter to get sued, says, well, we're going to detain the cash. You go on your way. And the only other thing he did, he helped draft an affidavit to show probable cause for forfeiture of the funds and forwarded that affidavit to a U.S. attorney's office in Georgia. Those are the only things the defendant did. Plaintiffs sued. And, by the way, the plaintiffs actually got their money back. But they said, well, the delay was terrible and we're entitled to an award under Bivens. And they said, and we're going to sue you in Nevada because that's where we live. And that's where we would have the injury. And, believe it or not, the Ninth Circuit said that flies. The Supreme Court said, well, that's not right. And because it was, again, insufficient to rely on the defendant's random, fortuitous, or attenuated contact, the defendant didn't do any act that really put into play Nevada at all. It was so random that they told the people in San Juan that they lived in California and Nevada. But it's something else that the court did in its very lengthy and reasoned opinion. It went on to explain why its decision in Calder v. Jones was appropriate. That was a defamation case. Calder v. Jones was a defamation case. They said, look, what we decide here is it doesn't run afoul of what we decided in Calder v. Jones, where defendants who didn't visit California, didn't send the offending articles into California, but the plaintiff was injured in California, Shirley Jones. The article was all about her existence in California. And it was that tort. And it's very interesting to see what they actually said. First of all, this is the Supreme Court talking about what happened in Calder v. Jones. We found those form contacts to be ample. The defendants formed contacts in Calder v. Jones. The defendants relied on phone calls to California sources for the information for their article. That's very important. Because the contact to California wasn't defaming the plaintiff. They were calling California to get information for their articles. That is no different than what Dr. Kessler did here. No different at all. The court went on to say, the courts of Calder was that the reputation-based effects of the alleged rival connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the rival tort. So, and because of that, the defendants' intentional tort actually occurred in California. Again, in Wong v. Fury, they are endorsing what they did in Calder v. Jones. And it's also important to look at footnote 7. Because footnote 7 in the Wong v. Fury case, the Supreme Court said the defendants in Calder argued that no contacts they had with California were sufficiently purposeful because their employer was responsible for circulation of the article. In other words, we didn't send the article out. Somebody else did. The Supreme Court said no, no. We rejected that argument. Even though the defendants did not circulate the article themselves, they expressly aimed their intentional and allegedly tortious actions at California. And that's exactly what we have here. The whole reason why this whole thing started was because Kessler knew that my client was a Peoria competitor of his buddy from the NHF. And he reaches out and gets an earful. He tells NHF, we've got to correct this. We, that means we. I'm on the NHF board. I'm going to make sure that we correct this. This guy is a complete fraud. His words, I'm not making up. And it worked. And then we have what's already been determined to be by the trial court defamation per se that the NHF sent out. And we maintain that by expressly aiming and because this was not a random attenuated act. Going to Hanson just briefly. Hanson, the Missouri defendants just answered a phone call from an insurance adjuster. They didn't go into Illinois to ask the car accident didn't happen in Illinois. They were just sitting there in Missouri. They picked up the phone. Insurance adjuster says, hey, were you in an accident with these people? And they said no. And he called them again. Are you sure? He said no. And they were saying, the plaintiff was saying, well that's enough under specific jurisdiction to get them for defamation. Those calls could have come from Alaska, Ohio, Rhode Island. That's so crazy. Because the defendants weren't expressly aiming anything at Illinois. They were responding to a telephone call. And that's the key case they relied on below. It's the key case they relied on here. I submit to you that the Supreme Court's analysis, Warren Furey, he says it all. Thank you. Any questions? Yes. What did he say about your colleague's argument that Tamburo was illegal? Oh, he cited to a district court case, NTE, Judge Zagel. I encourage the court to keep, the Seventh Circuit is still citing Tamburo as good law. We've cited, at least in the court below, we've cited several Illinois appellate courts still looking at Tamburo. And Tamburo is interesting because Tamburo didn't rely on just the site of the injury. Tamburo being clear, and I quote from Tamburo, this case involves both form state injury and tortious conduct specifically directed at the form. In other words, entirely consistent with what Walden later said. So I submit to you that there's been no overruling of Tamburo and it's being cited today in state courts and in federal courts. In the Seventh Circuit, in the Northern District of Illinois, there have been several recent decisions out of the Northern District of Illinois, I think even involving defamation, that had I been on my game, I would have submitted to the court in advance of the argument, but I didn't. But no, it's not been overruled and it's entirely consistent with Walden. But I'm suggesting the court need not even go to Tamburo because Walden says it all. Thank you. Thank you again. I'm trying to get in everything I'd like to say. But what it comes down to is this. What I noticed from Appley's argument is a couple of things. First, with respect to the test, although Tamburo technically has not been overruled, he's correct in that respect, the test as passed down in the Walden case, for all intents and purposes, completely undermines it. It says that the form of state injury is not the inquiry. It's not, and that's been his argument this whole time, is that even if we take for granted that Dr. Kessler, even though it's not anywhere in the emails, was trying to get back at a competitor, and I'll get to that in a second because there's no evidence of that whatsoever, that's not the analysis for this court. The analysis for the court pursuant to the Illinois Supreme Court under Walden is whether there is a meaningful connection. The meaningful connection is analyzed pursuant to the facts of the case. Now, what I did notice there is that Appley's counsel went out of his way to not discuss any cases that had anything to do with defamation whatsoever because there are no Illinois cases. There are no federal cases. There are no cases from across the country. I've looked where there are similar facts, where an individual who sent correspondence, in any respect similar to this, where personal jurisdiction was found to be appropriate. It just doesn't exist. The reason that he's focused on Walden v. Fury in an Illinois Supreme Court case instead of Hanson or Bombas or any of the other cases in Illinois that actually contain even remotely similar factual situations is because none of those support their position. With respect to his characterization of Dr. Kessler, and this is something I wanted to focus on because he does it throughout his brief and he did it extensively today, he talks about what the entire reason of what Dr. Kessler did, that he jumped into the fray, that the NHS decision was central to Dr. Kessler's effort, that he was a schooling victim, that his invective worked. These are all opinions of Appley's counsel. He is characterizing what he believes Dr. Kessler was doing. And he's entitled to that. He's entitled to his opinion as to what Dr. Kessler did. The reason that's not the appropriate analysis is because in cases like Bombas, which this Court previously decided that jurisdiction was appropriate, is because there was no guessing necessary in the Bombas case. In that case, as in Tamboro, those defendants specifically reached into Illinois and in no uncertain terms made it clear to the plaintiffs that they were trying to visit financial ruin upon those plaintiffs. None of that happened in this case. The two emails that are appropriate in this case involve an evaluation by Dr. Kessler that, you know what, maybe this award wasn't given correctly. There's no evidence that he was on Dr. Tarantino's side, that they were friends. This is all in the head of Appley's counsel. And again, he's entitled to his opinion as to what Dr. Kessler was doing. But the reason that he has to invent this sort of motivation is because in cases like Bombas and in cases like Tamboro where personal jurisdiction was found to be appropriate, that kind of motive didn't require divination. The Court could look at the emails and the actions of the defendants in that case and say, oh, goodness, well, you were clearly trying to affect them in Illinois. You were trying to ruin their business. You emailed them, called them, sent them letters directly. You actually reached into the state and tried to affect these individuals directly, financially, personally, by means of defaming them to other third parties, in some cases on hundreds of occasions. In this case, that simply didn't happen. Again, just very briefly, with respect to the complete fraud email, the Court needs to disregard that. That was not an email that was sent to anyone in Illinois. If it establishes jurisdiction anywhere, as Your Honor pointed out, that might establish personal jurisdiction in New York or New Jersey, depending on where Mr. Bias was. But there's no evidence that anyone in Illinois ever read that, that he ever sent that to anyone in Illinois, or that for the purposes of personal jurisdiction, that it establishes personal jurisdiction, specific personal jurisdiction, or for Dr. Kessler in this case. Lastly, with respect to the express aiming test, and this is kind of coming back to what I was saying at the beginning, that express aiming test simply isn't the analysis for this Court. Even if we, again, ignore the Hansen case, the Bambos case, the Illinois standard for the purposes of determining personal jurisdiction, and I'll hand it to Plaintiff's counsel, he's taken our eye off the ball in that respect, because that is the analysis. The analysis is not expressive. The Hansen case specifically said that the last act doctrine of saying, simply alleging, well, I suffered damages here, is not sufficient for the purposes of establishing personal jurisdiction in this case. Thank you. Thank you.